[S.F. No. 24026. Jan. 29, 1980.]

THE PEOPLE, Plaintiff and Appellant, v.
GEORGE A. SHIROKOW, Defendant and Respondent.

**COUNSEL**

Evelle J. Younger and George Deukmejian, Attorneys General, R. H. Connett, Assistant Attorney General, and Joel S. Moskowitz, Deputy Attorney General, for Plaintiff and Appellant.

Porter A. Towner, John Kramer and David B. Anderson as Amici Curiae on behalf of Plaintiff and Appellant.

Green, Green & Rigby and Denslow Green for Defendant and Respondent.

James G. McCain, Sharp & Maroot, Sidney J. W. Sharp, Jr., Glenda K. Doan, Pat S. McInturff, Clawson, Timm & Atkinson and Lawrence W. Clawson as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**MOSK, J.**—The State of California appeals from a judgment denying its request for an injunction against defendant for his unauthorized diversion of water.

In this case of first impression we are asked to decide the circumstances under which the state may obtain an injunction pursuant to

Water Code section 1052.[1] Our key inquiry is whether defendant's use of water is subject to the appropriation procedures of the code, so that failure to comply provides grounds for injunctive relief.[2] Defendant asserts his use of water, though unauthorized by the State Water Resources Control Board (board), is pursuant to a prescriptive right. It has long been debated whether the Water Code's comprehensive scheme for the granting of appropriative rights by the board (§ 1200 et seq.) precludes the acquisition of prescriptive rights in circumstances such as these in which a nonriparian user asserts rights in water based on adverse use initiated after the enactment of the code.[3]

As will appear, we conclude the better view requires denial of acquisition of such rights as against the state. Accordingly, defendant's diversion of water without first obtaining a permit from the board constituted a trespass within the meaning of section 1052, and the state was authorized to seek an injunction against such trespass. The trial court's judgment refusing to enjoin the unauthorized diversion must therefore be reversed.

Defendant owns approximately 4,020 acres of land located in the low mountain region of eastern Madera County. He acquired the property in 1965 and uses it for cattle grazing and recreational purposes. Arnold Creek, an intermittent stream, flows through the property in the winter and early spring and is usually dry in the summer and fall; it is a tribu-

---

[1]Section 1052 provides: "The diversion or use of water subject to the provisions of this division [division 2] other than as authorized in this division is a trespass, and the board [State Water Resources Control Board] may institute...appropriate action to have such trespass enjoined." All statutory references are to the Water Code unless otherwise noted.

[2]All references to "water," unless otherwise noted, are limited to surface water and to subterranean streams flowing through known and definite channels. Percolating ground water is specifically excluded from our consideration. (See § 1200.)

[3]See 3 Witkin, Summary of California Law (8th ed. 1973) Real Property, section 587, page 2253; Final Report, Governor's Commission to Review California Water Rights Law (Dec. 1978) pages 31-32. For an expression of the view that no right to nonriparian use of water may be acquired short of full compliance with the appropriation permit procedures of the Water Code, see Craig, *Prescriptive Water Rights in California and the Necessity for a Valid Statutory Appropriation* (1954) 42 Cal. L.Rev. 219; Hutchins, The California Law of Water Rights (1956) pages 334-335. For the contrary view, see Kletzing, *Prescriptive Water Rights in California: Is Application a Prerequisite?* (1951) 39 Cal.L.Rev. 369; Trowbridge, *Prescriptive Water Rights in California: An Addendum* (1951) 39 Cal.L.Rev. 525; 1 Rogers and Nichols, Water for California (1967) pages 326-327. See also Hutchins, Selected Problems in the Law of Water Rights in the West (1942) pages 400-402; Wiel, *Unregistered Water Appropriations at Law and in Equity* (1926) 14 Cal.L.Rev. 427.

tary of Fine Gold Creek which is in turn a tributary of the San Joaquin River.

Some time before 1960, defendant's predecessor in interest constructed a dam and reservoir with a capacity of approximately 19.5 acre feet of water. Because the headwaters of Arnold Creek commence approximately one mile north of defendant's property, the dam captures the first flows of the creek and prevents any water from passing downstream until the reservoir is filled. The reservoir capacity is sufficient to maintain a water supply for livestock and fishing for the entire year; in extreme drought years the reservoir goes dry. Except for evaporation, seepage, and use for livestock watering and irrigation, all of the flow of Arnold Creek which is not impounded by the reservoir passes over the spillway and continues downstream, eventually reaching the San Joaquin River above Friant Dam. There the water—which at this point is controlled by the United States government as part of the federal Central Valley Project and is not within the State Water Resources Development System—is collected for diversion into the Madera and Friant-Kern canals or released downstream. Except for occasional flood flows released by the federal government at Friant, no water originating in Arnold Creek is available to the State of California.

Defendant and his predecessor in interest have paid all taxes assessed on the dam, reservoir, and impounded water, the use and possession of which they have enjoyed exclusively since the date of construction. The dam was constructed without a permit from the board, and no permit was obtained to appropriate the impounded water.[4]

On March 1, 1976, the state, at the request of the board, filed this action under section 1052 seeking an injunction against defendant's diversion of water. Defendant admitted the diversion and impoundment of the water but alleged that he and his predecessor in interest have each "openly, notoriously, under claim of right, and adverse to all persons owning property downstream from his property, impounded and stored the waters of Arnold Creek behind said dam, and [have] placed the

---

[4]On two occasions defendant filed applications to appropriate 19.5 acre feet of water. The first was denied when he failed to comply with the condition of a brush removal program sufficient to salvage the required amount of water. Defendant abandoned the second application upon learning the required brush removal program would cost $8,500. (See § 1253, providing the board may, in granting applications to appropriate water, impose "such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest the water sought to be appropriated.")

same to beneficial use, and [have] paid all taxes assessed thereon." Accordingly, defendant asserted as a defense that he had acquired a prescriptive right against all persons downstream, including the state. The trial court held defendant had perfected a prescriptive right which was good as against the state and denied the request for injunctive relief.

■ Whether defendant's diversion of water may be enjoined under section 1052 turns on our interpretation of the phrase "water subject to the provisions of this division [division 2]." We are not aided by the omission in division 2 of any definition of the water which is subject to its provisions.

Part 2 of the division provides a comprehensive scheme for the appropriation of water. It defines water subject to appropriation (§§ 1200-1203); declares compliance with the provisions of division 2 to be the exclusive means of acquiring the right to appropriate or use water subject to appropriation (§ 1225); authorizes the board to act upon all applications for permits to appropriate water, to grant permits to take and use water subject to the terms and conditions of the permit, and to collect fees (§§ 1250-1550); and provides for the issuance of licenses confirming the right to appropriate such amount of water as has been beneficially used by the permittees (§§ 1600-1677). Thus it is clear that if the water diverted by defendant is water subject to appropriation, then it is water subject to the provisions of division 2 and any use thereof is conditioned upon compliance with the statutory procedure.

We next consider the statutory provisions defining the water subject to appropriation. Because an understanding of section 1201 is crucial to the analysis, we set forth the language in its entirety: "All water flowing in any natural channel, excepting so far as it has been or is being applied to useful and beneficial purposes upon, or in so far as it is or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is hereby declared to be public water of the state and subject to appropriation in accordance with the provisions of this code."[5] ■ In construing the meaning of this language, we are mindful that the goal of statutory construction is ascertainment of legislative intent so that the purpose of the law may be

---

[5]Section 1200 limits the term "water," as used in connection with appropriation applications, permits, and licenses, to include only surface water and subterranean streams flowing through known and definite channels. (See *ante,* fn. 2, p. 304.)

effectuated, and that we should construe a statute in the context of the entire statutory system of which it is a part, in order to achieve harmony among the parts. (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322], and cases there cited.)

Section 1201 is derived from section 11 of the Water Commission Act, Statutes 1913, chapter 586;[6] before ascertaining the legislative intent of that act, a brief history of some aspects of California water law will be helpful. ■ California operates under the so-called dual system of water rights which recognizes both the appropriation and the riparian doctrines. (Hutchins, The California Law of Water Rights, *supra,* at pp. 40, 55-67.) The riparian doctrine confers upon the owner of land contiguous to a watercourse the right to the reasonable and beneficial use of water on his land.[7] The appropriation doctrine contemplates the diversion of water and applies to "any taking of water for other than riparian or overlying uses." (*City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 925 [207 P.2d 17], and cases there cited.) Both riparian and appropriative rights are usufructuary only and confer no right of private ownership in the watercourse. (3 Witkin, Summary of Cal. Law, Real Property, *supra,* at p. 2232.)

■ Prescriptive rights have been described as the "parasites of water rights [because] [t]he only way to obtain such rights is to take water rights away from someone else. . . ." (1 Rogers & Nichols, Water for Cal., *supra,* at p. 325.) As we have seen, there is controversy over whether prescriptive rights have survived the enactment of the Water Commission Act. Similarly, there is lack of agreement whether prescriptive rights enjoy an identity separate from appropriative rights (1 Rogers & Nichols, *op. cit. supra,* at p. 328) or are but a subclass of appropriative rights, title to which has ripened by virtue of the running of the statute of limitations (Hutchins, *op. cit. supra,* at p. 332).

Common law appropriation originated in the gold rush days when miners diverted water necessary to work their placer mining claims. The

---

[6]The act became effective by referendum on December 19, 1914.

[7]Although defendant is a riparian landowner, his diversion and seasonal storage, i.e., storage in the wet season for use in the dry, is not a proper riparian use. (*Moore* v. *Cal. Oregon Power Co.* (1943) 22 Cal.2d 725, 731 [140 P.2d 798]; *Colorado P. Co.* v. *Pacific G. & E. Co.* (1933) 218 Cal. 559, 564 [19 P.2d 598, 24 P.2d 495]; *Seneca C. G. M. Co.* v. *Gt. Western Power Co.* (1930) 209 Cal. 206, 215 [287 P.93, 70 A.L.R. 210].)

miners adopted among themselves the priority rule of "first in time, first in right," and California courts looked to principles of equity and of real property law to adjudicate conflicting claims. (See Address by Chief Justice Shaw, The Development of the Law of Waters in the West (1922) 189 Cal. 779; Hutchins, *op. cit. supra,* at pp. 41-49; 1 Rogers & Nichols, *op. cit. supra,* at pp. 254-256.) Thus it was initially the law in this state that a person could appropriate water merely by diverting it and putting it to use.

The first appropriation statute was enacted in 1872 and provided for initiation of the appropriative right by the posting and recordation of notice. (Civ. Code, §§ 1410-1422.) The nonstatutory method retained its vitality and appropriative rights were acquired by following either procedure. (Hutchins, *op. cit. supra,* at p. 86.)

Both methods were superseded by the 1913 enactment of the Water Commission Act, which created a Water Commission and provided a procedure for the appropriation of water for useful and beneficial purposes.[8] The main purpose of the act was "to provide an orderly method for the appropriation of [unappropriated] waters." (*Temescal Water Co. v. Dept. Public Works* (1955) 44 Cal.2d 90, 95 [280 P.2d 1]; *Bloss v. Rahilly* (1940) 16 Cal.2d 70, 75 [104 P.2d 1049].) By amendment in 1923, the statutory procedure became the exclusive means of acquiring appropriative rights. (§ 1225, Stats. 1923, ch. 87.)[9] The provisions of the Water Commission Act, as amended from time to time, have been codified in Water Code, divisions 1 and 2. (Stats. 1943, ch. 368.)

Section 1050 declares division 2 to be in furtherance of the Constitution, article X, section 2 (added by amendment as art. XIV, § 3, in 1928), which provides in part: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable. . . and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof

---

[8]The powers of the original Water Commission in respect to the appropriation system are now vested in the board. (§ 179.) For a history of the predecessor agencies of the board, see Commentary, Craig, California Water Law in Perspective, 68 West's Annotated Water Code (1971 ed.) at pages LXV, LXXV-XCV.

[9]For a discussion of the provisions of the Water Commission Act and the appropriation procedure set forth therein, see Hutchins, The California Law of Water Rights, *supra,* at pages 94-119; Ferrier, *Administration of Water Rights in California* (1956) 44 Cal.L.Rev. 833.

in the interest of the people and for the public welfare."[10] (Cf. § 100.) The Water Code articulates a policy consistent with that expressed in the 1928 amendment and provides that all water within the state is the property of the people (§ 102), the people have a paramount interest in the use of all water of the state (§ 104), and the state shall determine the manner in which the water of the state should be developed for the greatest public benefit (§ 105). These declarations of policy together with the comprehensive regulatory scheme set forth in section 1200 et seq. demonstrate a legislative intent to vest in the board expansive powers to safeguard the scarce water resources of the state.

These considerations lead us to conclude section 1201 should be interpreted in such a manner that the waters of the state be available for allocation in accordance with the code to the fullest extent consistent with its terms. In *Bloss* v. *Rahilly, supra,* 16 Cal.2d at pages 75-76, we observed the language of section 1201 evinces "an intention to declare the waters of the state to be subject to appropriation in so far as that can be done without interfering with vested rights." The Constitution, too, provides for the protection of appropriators, but only to the extent the appropriator is "lawfully entitled" to water. (Cal. Const., art. X, § 2.) The rights not subject to the statutory appropriation procedures are narrowly circumscribed by the exception clause of the statute and include only riparian rights and those which have been otherwise appropriated prior to December 19, 1914, the effective date of the statute.[11] Any use other than those excepted is, in our view, conditioned upon compliance with the appropriation procedures of division 2. (§§ 1052, 1225; *Crane* v. *Stevinson* (1936) 5 Cal.2d 387, 398 [54 P.2d 1100]; *State of California* v. *Hansen* (1961) 189 Cal.App.2d 604, 610 [11 Cal.Rptr. 335].)

To conclude otherwise would substantially impair the board's ability to comply with the legislative mandate that appropriations be consistent with the public interest. (§ 1255.) For example, the salutary effects of

[10]Article XIV, section 3 was repealed on June 8, 1976. Article X, section 2 was adopted on the same date and contains the identical language.

[11]Section 1201 by its terms excepts from water subject to appropriation riparian rights which are being applied to, or *may be* reasonably needed for, useful and beneficial purposes. The status of prospective riparian rights is discussed in our recent opinion in *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339 [158 Cal.Rptr. 350, 599 P.2d 656]. The opinion holds the board possesses broad authority in statutory adjudications pursuant to section 2500 et seq. to make determinations as to the scope, nature, and priority of future riparian rights, in order to foster the most reasonable and beneficial use of the scarce water resources of the state.

the comprehensive system of water rights administration would be imperiled if the board were powerless to enjoin an adverse use of water which the board had previously otherwise allocated, or desired to allocate, in the public interest. Moreover, the board is hindered in its task by any uncertainty as to the availability of water for appropriation. The problem is compounded by nonsanctioned uses which make it difficult for the board to determine whether the waters of the state are being put to beneficial use for the greatest public benefit. (Cf. § 105.)[12]

Our holding that the state is entitled to an injunction against defendant's unauthorized diversion of water, will not result in the destruction of all beneficial uses of water originally undertaken in reliance on prescription. ■ The board's broad discretion to act on appropriation applications is not unfettered; while it is true the issuance of permits depends on questions of policy and judgment (§ 1255), the board may not arbitrarily and capriciously reject an application. (*East Bay M. U. Dist. v. Dept. of P. Wks.* (1934) 1 Cal.2d 476, 481 [35 P.2d 1027].) Moreover, the code provides for judicial review by writ of mandate to inquire into the validity of board action. (§§ 1360, 1412, 1615.)

In this case defendant has twice filed applications to appropriate water. The board was willing to grant him the right to continue his use if he instituted a brush removal program to salvage the required amount of water, a condition the board had authority to impose for protection of the public interest. (§ 1253.) When he discovered it would cost $8,500 to fulfill this requirement, defendant voluntarily abandoned his efforts to obtain a permit and determined to rely on his claimed prescriptive right.

On the basis of these circumstances, we cannot assume that existing beneficial uses lacking board authorization will be unduly jeopardized by requiring the users to file applications with the board. If the board determines a particular use is not in furtherance of the greatest public benefit, on balance the public interest must prevail.[13]

---

[12]In *In re Waters of Long Valley Creek System, supra,* 25 Cal.3d at page 356, footnote 12, the opinion observes the need for certainty in the administration of water rights to be "readily apparent when one examines the statutory framework governing appropriative rights in California." See Final Report, Governor's Commission to Review California Water Rights, *supra,* at pages 21-25, in which the consequences of uncertainty are discussed. The report states "[P]rescription exacerbates the lack-of-knowledge problem which hinders effective planning, management, and enforcement of water and water rights." (*Op. cit. supra,* at p. 32.)

[13]In view of our conclusion, it is not necessary for us to consider the state's contention that section 2501 is determinative of the fact that all water rights, whether based

 Even if arguendo we were to hold defendant was not required to comply with the statutory appropriation procedures, his claim of a prescriptive right would fail for two reasons.

First, public rights cannot be lost by prescription. Defendant alleged and the trial court agreed that as against the state he had perfected a prescriptive right. Both were mistaken. What is being challenged is the state's governmental interest in regulating the use of public waters rather than any proprietary interest in the water claimed by defendant. The stipulated facts do not reveal that the state was using the water; indeed, defendant admits the state, if successful in obtaining the injunction, will not make use of the water. Thus it is undisputed that the state's interest here at stake is nonproprietary.

More than a century ago, in *Hoadley v. San Francisco* (1875) 50 Cal. 265, 274-276, we articulated the rule that property held by the state in trust for the people cannot be lost through adverse possession. The statute of limitations is of no effect in an action by the state to recover such property from an adverse possessor whose use of the property for private purposes is not consistent with the public use. (*People v. Kerber* (1908) 152 Cal. 731, 733-734 [93 P. 875].) In a case involving pueblo water rights, we applied these principles in holding neither public rights and properties which the state possesses and administers, nor the public trust as to their administration and exercise, can be destroyed by adverse possession. (*City of San Diego v. Cuyamaca Water Co.* (1930) 209 Cal. 105, 136 [287 P. 475].) In accordance with these decisions, defendant cannot have acquired a prescriptive title to the public rights in the waters of the state which the board is charged to administer, nor can he assert the statute of limitations as a defense to this action.[14] Similarly, his equitable defense of laches must fail because *Kerber* and *City of San Diego* also held public rights cannot be lost by laches.

upon riparian rights, appropriation, or other rights, are subject to the provisions of division 2. That section is contained in part 3 of division 2, which provides for statutory adjudication of rights to water of a stream system. We note, however, that the definition of water subject to the statutory adjudication procedure is specifically limited to its use in part 3, chapter 3.

[14]Defendant alleges numerous sections of the Code of Civil Procedure prescribing periods of limitation as affirmative defenses (e.g., §§ 318, 319, 322, 315, 320, 338, 345). We note that prescription and limitations are deemed convertible terms insofar as title to real property is concerned. (*Alhambra Addition Water Co. v. Richardson* (1887) 72 Cal. 598, 601 [14 P. 379].) Therefore defendant's plea of the statutes of limitations is redundant.

Defendant's contention that the provisions of Civil Code section 1007 are determina-

The second reason defendant cannot prevail in his claim of a prescriptive right is that the stipulated facts do not provide the necessary elements. Defendant has not shown his diversion was hostile to the interests of any downstream user; we are told only that there was general community knowledge that the dam and reservoir existed and water was impounded. Since it is axiomatic that common law prescriptive rights are based on adverse use, such rights could not have been obtained by defendant by a taking of excess water which did not invade the interests of another. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at p. 926; *San Bernardino* v. *Riverside* (1921) 186 Cal. 7, 22-23 [198 P. 784]; *Utt* v. *Frey* (1895) 106 Cal. 392, 396 [39 P. 807].) Not only did defendant fail to identify any downstream users having actual knowledge of his diversion (see *Pabst* v. *Finmand* (1922) 190 Cal. 124, 129-130 [211 P. 11]), no downstream users were parties to this action. Accordingly, the court lacked jurisdiction to adjudicate their rights vis-à-vis those of defendant.[15] (*Bowles* v. *Superior Court* (1955) 44 Cal.2d 574, 583 [283 P.2d 704]; *Bank of California* v. *Superior Court* (1940) 16 Cal.2d 516, 521-523 [106 P.2d 879]; *Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201, 214 [137 Cal.Rptr. 118]; Code Civ. Proc., § 398.)

---

tive of the issue whether prescriptive rights may be acquired in state-owned waters is without merit. As originally enacted in 1872, section 1007 provided occupancy of property for the period prescribed by the applicable statute of limitations conferred a title by prescription. In 1935 the section was amended to immunize against prescription title to property held by the governmental entities therein specified; the state was not among the enumerated entities. Section 1007 was amended to its present form in 1968 and the protection from loss by prescription extends to any "water, water rights,...or other property whatsoever...dedicated to or owned by the state...." (Civ. Code, § 1007.) (See 3 Witkin, Summary of Cal. Law, Real Property, *supra,* at pp. 1811-1812.) Defendant maintains the fact that prior to 1968 the state was not among the protected entities and his use was initiated before that date "should be determinative of this case." This conclusion misses the mark because it has long been settled that even before the 1935 and 1968 amendments, it was only governmental property held in a proprietary capacity and not dedicated to a public use that was subject to loss by prescription. (*Southern Pac. Co.* v. *City & County of S. F.* (1964) 62 Cal.2d 50, 53, fn. 1 [41 Cal.Rptr. 79, 396 P.2d 383]; *Henry Cowell Lime & Cement Co.* v. *State* (1941) 18 Cal.2d 169, 172 [114 P.2d 331], and cases there cited.) Thus the primary effect of the amendments was to immunize property held by the state and governmental entities regardless of the character of the interest in the property; the protected status of non-proprietary state interests was secure long before 1968.

[15]The extensive discussion in the concurring and dissenting opinion of our purported abolition of all property rights in water acquired by prescription (*post,* pp. 318-322) bears no relationship to reality. We hold here only that defendant's claim of prescriptive rights cannot lie *as against the state* when it seeks to enjoin unauthorized use pursuant to section 1052. It is unnecessary for us to reach the question of whether and under what circumstances prescriptive rights in water may be perfected as between private parties.

Finally, we are unmoved by defendant's fear that the state is improperly seeking to "destroy a stock watering pond that has been in existence...since the mid 1950's." He relies on the legislative policy articulated in section 1226, added in 1974, which declares that in light of the uncertain status of water rights resulting from the construction of impoundment structures for livestock watering use, it is desirable that the right to water impounded by such structures be clarified. The Legislature obviously sought to protect the needs of small farmers, for in sections 1226.1-1226.4 it provided a means of establishing water rights for any such structure *the capacity of which does not exceed 10 acre feet of water.* The statute is inapposite here, since defendant concedes, as he must, that he cannot claim a water right pursuant to section 1226.1 because the capacity of his reservoir substantially exceeds the statutory ceiling of 10 acre feet.

The judgment is reversed.

Bird, C. J., Tobriner, J., Manuel, J., and Newman, J., concurred.

**CLARK, J.,** Concurring and Dissenting.—Water Code section 1052, permitting the State Water Resources Control Board to institute injunction proceedings, must be read in light of California Constitution, article X, section 2 (formerly art. XIV, § 3), requiring full beneficial water use and prevention of water waste. When, as in the instant case, it is undisputed defendant is using diverted water in a reasonable manner and for beneficial purposes, the Constitution commands the state may not obtain an injunction without establishing that the water is necessary for other reasonable and beneficial uses and will not be wasted.

The stipulated facts fall below the state's burden. I dissent from the majority's holding that the state is entitled to an injunction. (*Ante,* p. 310.) Moreover, even if an injunction were permitted, it should recognize defendant's 10 acre foot statutory water right.

While I concur in the majority determination that the stipulated facts do not evidence a property right in water by prescription (*ante,* p. 312), the state in seeking the injunction must prevail on its own case—not on the weakness of defendant's case. Absence of the prescriptive right does not warrant an injunction. Finally, I dissent from the majority's most startling determination: property rights in water may never be acquired by prescription. (*Ante,* pp. 306-310.) In making the

latter determination the majority fail to even mention numerous cases upholding property rights in water acquired by prescription.

## I

Prior to 1913 this court rigidly adhered to the common law doctrine that "reasonable use" did not apply between a riparian owner and an appropriator. (E.g., *Miller & Lux* v. *Madera Canal etc. Co.* (1909) 155 Cal. 59 [99 P. 502]; *Miller* v. *Bay Cities Water Co.* (1910) 157 Cal. 256 [107 P. 115].) In 1913 the Legislature attempted to alter the common law doctrine by adopting the Water Commission Act. (Stats. 1913, p. 1012.) This act attempted to limit riparian water rights to beneficial and reasonable uses and to define, on an acre basis, what constituted beneficial use. Further, the act vested the water commission with authority to determine what waters remained unappropriated. In *Tulare Water Co.* v. *State Water Com.* (1921) 187 Cal. 533 [202 P. 874], this court invalidated the provision vesting authority in the water commission as an unlawful delegation of judicial power.

Then, in *Herminghaus* v. *South. California Edison Co.* (1926) 200 Cal. 81, 117 [252 P. 607], this court held the Legislature lacked constitutional power to assume "the right to determine" useful and beneficial purposes. The court reiterated: "The doctrine that a riparian owner is limited to a reasonable use of the water applies only as between different riparian proprietors. As against an appropriator who seeks to divert water to nonriparian lands, the riparian owner is entitled to restrain any diversion which will deprive him of the customary flow of water which is or may be beneficial to his land. He is not limited by any measure of reasonableness." (200 Cal. at pp. 100-101.)

Immediately following the *Herminghaus* decision, the Legislature proposed the provisions now found in article X, section 2, as an amendment to the Constitution. The arguments made in support of the proposed amendment made special reference to the common law doctrine then in effect. The arguments, however, were not limited to merely repudiating the common law doctrine. They also made reference to the amendment as an effort, in the public interest, to conserve our waters. (*Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673, 700 [22 P.2d 5].) The arguments spoke of conservation of a valuable natural resource as a general policy matter. The language of the amendment itself also is indicative of a concern larger than the immediate problem

presented by the *Herminghaus* decision. Thus, the first two sentences of the amendment are phrased in general terms. And the final sentence makes the amendment self-executing.

Article X, section 2, provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in furtherance of the policy in this section contained."

Shortly after the adoption of the amendment, it was emphasized that the reasonable use doctrine applied as between riparian owners and appropriators and between overlying owners and appropriators and that the "right to the waste of water is not now included in the riparian right." (*Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351, 368 [40 P.2d 486]; *Tulare Dist.* v. *Lindsay-Strathmore Irr. Dist.* (1935) 3 Cal.2d 489, 524 [45 P.2d 972]; *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 138-141 [60 Cal.Rptr. 377, 429 P.2d 889].)[1]

---

[1] In *Gin S. Chow* v. *City of Santa Barbara, supra,* 217 Cal. 673, 701-702, the court stated: "The present and future well-being and prosperity of the state depend upon the conservation of its life-giving waters. In his concurring opinion in *Miller* v. *Bay Cities Water Co., supra,* [157 Cal. 256 (107 P. 115, 27 L.R.A. N.S. 772)], Mr. Justice Shaw made the following appropriate comment on general water conditions in this state: 'In many parts of the state, especially in the large interior valleys, practically all the flood

Thus, when a riparian sought to enjoin an appropriator, it was no longer sufficient to find merely that the riparian was making a beneficial use of water. Rather, the quantity of such use must be determined, and if surplus exists, the appropriator may take it for reasonable and beneficial purposes. And if the riparian is contemplating future uses of some or all of the surplus, the appropriator may continue his use until such time as the riparian needs the water—"putting all of the available water to beneficial uses." (*Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d 489, 524-525.)

The Constitution's command of conservation is as applicable to the board as it is to riparians and appropriators. The board should not be permitted to require water wastage as a means to compel applications for permits to appropriate from those persons already making reasonable and beneficial use of water. Such administrative muscle flexing runs afoul not only of the constitutional provision but also of the basic statutes relating to the board's powers and duties. (See, e.g., Wat. Code, §§ 100, 101, 105, 1256-1258.) While the board may be hindered in performing its administrative function by lack of knowledge of all water claims, this does not warrant adopting rules that encourage water wastage. Because appropriation proceedings are often expensive, requiring permits of those who reasonably and beneficially use water that otherwise would be wasted may cause discontinuance of beneficial use and therefore waste. Those who use water reasonably and beneficially

---

waters are waste waters. They contribute little or nothing to the saturation of any subterranean gravel beds which are resorted to for a supply of water for useful purposes. They rush in great volume to the sea, carrying destruction in their path and overflowing the low lands to the great damage of the owners, serving no useful purpose whatever. If they were stored in reservoirs they might be made to serve a triple purpose. The extreme floods and consequent overflow and destruction would be prevented; the stored water could be used to irrigate large areas of the valley land, now left unproductive for lack of water; if distributed upon the plains, for irrigation, a large portion of these waters would in due course of time find their way by seepage and percolation to the channels of the streams...; all of which would add tremendously to the growth, prosperity and wealth of the state and to its ability to support the large population which its climate and productions attract. The question of the right to store such flood waters and the terms upon which it can be obtained or exercised is of the greatest importance to the future welfare of the state.'...These observations are self-evident, not only under present conditions, but for all time to come. It requires no extraordinary foresight to envision the great and increasing population of the state and its further agricultural and industrial enterprises dependent upon stored water—water that is now wasted into the sea and lost to any beneficial use. The conservation of other natural resources is of importance, but the conservation of the waters of the state is of transcendent importance. Its waters are the very life blood of its existence." (217 Cal. at pp. 701-702.)

should not be subjected to expensive appropriation proceedings or other administratively imposed burdens.[2]

Although the stipulated facts do not entirely settle the matter, they indicate that enjoining defendant's appropriation will result in wastage. Defendant captures the first flow of Arnold Creek. Flood control releases exist downstream at Friant Dam. Because of our annual rainfall and snowmelt patterns (see fn. 1), it is questionable whether the waters impounded by defendant would be used for reasonable, beneficial purposes if defendant did not appropriate.

Water Code section 1052, empowering the board to enjoin diversion of water other than that authorized, must be read in light of the conservation requirement of the Constitution and other statutes of the code. This provision was first adopted in 1913 (Stats. 1913, ch. 586, § 38, p. 1032), when, as we have seen, a riparian owner was entitled to enjoin any diversion depriving him of the customary flow, without regard to reasonableness of the riparian's use. (*Herminghaus* v. *South. California Edison Co., supra,* 200 Cal. 81, 100-101.) The constitutional amendment of 1928 made clear that our water resources must be put to beneficial use "to the fullest extent" capable and that waste, unreasonable use, and unreasonable method of use must be prevented. On the basis of the constitutional amendment this court concluded that the right to waste water is no longer included in the riparian right and that so long as surplus water exists the holder of prior rights may not enjoin its appropriation. (*Peabody* v. *City of Vallejo, supra,* 2 Cal.2d 351, 368; *City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 926 [207 P.2d 17]; *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 282 [123 Cal.Rptr. 1, 537 P.2d 1250].)

There being no exemption for administrative agencies or courts in the self-executing constitutional amendment, it follows that they may not require wastage. To the extent that Water Code section 1052 might permit enjoining reasonable, beneficial use of water with the result that water is wasted, the section is invalid. In accordance with conservation requirements of the Constitution, reasonable, beneficial water use may

---

[2]Before granting an appropriation permit the board must determine that there are surplus waters available for appropriation. (Wat. Code, § 1375, subd. (d).) Proceedings to determine whether such surplus exists may be and often are lengthy and complex, imposing large financial burdens not only on those seeking permits but also upon riparians and those having prior appropriative rights who must defend their rights. (Wat. Code, § 1300 et seq.)

only be enjoined where the water will be reasonably and beneficially used by riparians or other appropriators.

Moreover, absent interference with riparian or prior licensed appropriative right, defendant has a statutory "water right" to impound 10 acre feet of water in a stockpond (Wat. Code, §§ 1226-1226.2), and even assuming that an injunction should issue against the 19 acre feet impoundment, it should recognize the statutory water right.

## II

I concur in the majority opinion insofar as it holds the stipulated facts do not provide the necessary elements for a prescriptive right. "[A]n appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right. [Citations.]" (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 926-927; *City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d 199, 281-282.) The stipulated facts fail to show the water was not surplus or the requisite adversity.

## III

The majority today decree that no property right in surface water or subterranean stream has been acquired by prescription since 1913.[3] This is both startling and disturbing. It boldly ignores what has been occurring in the California courts for 65 years.

[3]Although the majority opinion might be read as being limited to denial of prescriptive rights only in the absence of appropriative permit, such limitation would be without meaning. All prescriptive rights in surface waters and subterranean streams are now precluded whether or not the claimant possesses a permit to appropriate. Prescriptive rights are initiated by trespass; there must be a wrongful taking. (*City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d 199, 281; *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 926-927; *Beckett* v. *Petaluma* (1915) 171 Cal. 309, 316 [153 P. 20]; 1 Rogers & Nichols, Water for Cal. (1967) § 226, p. 325.) Obviously, if water is taken pursuant to board permit, it is not taken wrongfully and no prescriptive right arises.

The majority state that they are not determining "whether and under what circumstances prescriptive rights in water may be perfected as between private parties." (*Ante,* p.312, fn. 15.) However, as a practical matter, the majority decide the issue they disclaim. We may not expect that the board will unlawfully discriminate in exercising its power to enjoin asserted post-1913 prescriptive rights to water. Thus all will be enjoined. Faced with the certainty of injunction, private parties may not be expected to seek to establish prescriptive rights against other private parties. Accordingly, the effect of today's opinion is to prevent recognition of all post-1913 prescriptive claims.

Numerous cases have recognized and enforced property rights by prescription in surface and subterranean streams based on post-1913 conduct. (*Moore* v. *Cal. Oregon Power Co.* (1943) 22 Cal.2d 725 [140 P.2d 798]; *Morgan* v. *Walker* (1933) 217 Cal. 607 [20 P.2d 660]; *Pabst* v. *Finmand* (1922) 190 Cal. 124 [211 P. 11]; *Armstrong* v. *Payne* (1922) 188 Cal. 585 [206 P. 638]; *Antioch* v. *Williams Irr. Dist.* (1922) 188 Cal. 451 [205 P. 688]; *Vallejo* v. *Montebello Sewer Co. Inc.* (1962) 209 Cal.App.2d 721 [26 Cal.Rptr. 447]; *Orange County Water Dist.* v. *City of Riverside* (1959) 173 Cal.App.2d 137 [343 P.2d 450]; *Lindsay* v. *King* (1956) 138 Cal.App.2d 333 [292 P.2d 23]; *Akin* v. *Spencer* (1937) 21 Cal.App.2d 325 [69 P.2d 430]; *Big Rock M. W. Co.* v. *Valyremo Ranch Co.* (1926) 78 Cal.App.266 [248 P. 264].)

Thirty years after the 1913 enactment, this court stated in a unanimous opinion: "The law is so well-established in this state as to require no extended citation of authorities that an upper riparian owner may acquire a prescriptive right to the waters of a stream as against a lower riparian owner by an adverse use of said waters for the prescriptive period. [Citation.]" (*Moore* v. *Cal. Oregon Power Co., supra,* 22 Cal.2d 725, 735.)[4]

---

[4]Six years later, this court again stated the doctrine that water rights could be acquired by adverse user: "Prescriptive rights are not acquired by the taking of surplus or excess water, since no injunction may issue against the taking and the appropriator may take the surplus without giving compensation; however, both overlying owners and appropriators are entitled to the protection of the courts against any substantial infringement of their rights in water which they reasonably and beneficially need. (*Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 368-369, 374 [40 P.2d 486].) Accordingly, an appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right. (*City of San Bernardino* v. *City of Riverside,* 186 Cal. 7, 22-23 [198 P. 784]; *Katz* v. *Walkinshaw,* 141 Cal. 116, 135 [70 P. 663, 74 P. 766, 99 Am. St.Rep. 35, 64 L.R.A. 236]; 25 Cal.Jur. 1178, 1157-1158; 1 Cal.Jur. 585; 26 Cal.Jur. 278-279; cf., *Wutchumna Water Co.* v. *Ragle,* 148 Cal. 759, 764-765 [84 P. 162].) To perfect a claim based upon prescription there must, of course, be conduct which constitutes an actual invasion of the former owner's rights so as to entitle him to bring an action. (*City of Los Angeles* v. *City of Glendale,* 23 Cal.2d 68, 79 [142 P.2d 289].) Appropriative and prescriptive rights to ground water, as well as the rights of an overlying owner, are subject to loss by adverse user. This is in accord with the rule announced in cases dealing with water in a surface stream. (See *Yankee Jim's Union Water Co.* v. *Crary,* 25 Cal. 504, 508-509 [85 Am.Dec. 145]; *Big Rock M. W. Co.* v. *Valyermo Ranch Co.,* 78 Cal.App. 266, 273 [248 P. 264]; *Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 374 [40 P.2d 486]; *Duckworth* v. *Watsonville etc. Co.,* 150 Cal. 520, 529-532 [89 P. 338]; *Davis* v. *Gale,* 32 Cal. 26, 35 [91 Am.Dec. 554]; 3 Farnham, Waters and Water Rights [1904]; § 680a, p. 2106; 1 Wiel, Water Rights [3d ed., 1911], § 580, pp. 625-626; 56 Am.Jur. 773.)" (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 926-927.)

Failing to recognize the numerous decisions enforcing prescriptive rights, are we not inviting future justices of this court to accord similar deference to our opinions?

The appropriation provisions of Water Code section 1225 do not require abrogation of rights acquired by prescription. The section provides: "[N]o right to appropriate or use water *subject to appropriation* shall be initiated or acquired except upon compliance with the provisions of this division." (Italics added.) Water Code section 1201 makes clear that the waters "subject to appropriation" are surplus waters—waters which are not reasonably needed for useful and beneficial riparian purposes or previously appropriated. (See also Wat. Code, § 1375, subd. (d).)

The statutes have no relation to property rights acquired by prescription because prescriptive rights may not be acquired in surplus waters. "Prescriptive water rights in California are, in a sense, the parasite of water rights. The only way to obtain such rights is to take water rights away from someone else." (1 Rogers & Nichols, Water for Cal., *supra,* § 226, p. 325.)

"Prescriptive rights are not acquired by the taking of surplus or excess water, since no injunction may issue against the taking and the appropriator may take the surplus without giving compensation." (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 926; *City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d 199, 282.)

While the board has the power to define riparian rights among competing riparian users and to quantify future riparian rights (Wat. Code, § 2500 et seq.; *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 347 et seq. [158 Cal.Rptr. 350, 599 P.2d 656]), I am unaware of any case permitting the board to terminate existing reasonable riparian rights by licensing new appropriators. By way of contrast, when the prescriptive right matures, it is a right originally belonging to someone else. (1 Rogers & Nichols, Water for Cal., *supra,* § 228, p. 328.) In order to show the requisite adverse use, the claimant must establish actual invasion of the former owner's right (e.g., *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 926), and because of the requisite adverse use, the taking ordinarily will be from an existing riparian user.

While Water Code section 1200 et seq. relates primarily to allocation of surplus waters, whereas prescriptive rights are obtained by adverse user infringing upon riparian rights or unenforced appropriative rights, the two acquisitions are essentially unrelated. Regarding reasonable riparian uses, prior licensed appropriative uses, and claimed prescriptive uses, the board has an adjudicatory function—determining rights. Regarding surplus waters, the board possesses much greater power, performing a licensing function—permitting allocation among various potential users. The statutory system is comprehensive only as to surplus waters; it is not comprehensive as to riparian rights for reasonable use, prior appropriative rights for such use, or loss of rights through prescriptive reasonable use.[5] Accordingly, the statutory system does not support this court's abolition of rights obtained through prescription—reasonable and beneficial uses exercised over the past 60 years.

It is true as the majority states that recognizing prescriptive rights may hinder the board in determining what waters are now available for appropriation. But the hindrance is minor. There being no requirement to register riparian uses, the uncertainty is not alleviated by governmental abrogation of prescriptive rights and resurrection of lost riparian rights.[6]

The majority's suggestion that those losing prescriptive rights for reasonable beneficial use will now be able to acquire appropriative permits—and therefore such uses are not jeopardized by today's decision—must be rejected. (*Ante,* p. 310.) Issuance of an appropriation permit depends on availability of surplus water. As pointed out above, prescriptive rights may not be acquired when there is surplus water. Reason suggests a paucity of situations in which there have been *in the past a lack of surplus water* permitting a prescriptive right under traditional law, but at the *present time* there exist *surplus waters* permitting appropriation permits. Available surplus water decreases as population increases.

---

[5]A prescriptive right to unreasonable water use is unobtainable. (*Oliver v. Robnett* (1922) 190 Cal. 51, 53-54 [210 P. 408].)

[6]Although the matter does not appear from the record the instant decision may impose a huge monetary burden on governmental agencies and utilities. In some cases a utility building a dam to store water for power purposes has been held to have acquired a prescriptive right through adverse use against riparians. (E.g., *Moore v. Cal. Oregon Power Co., supra,* 22 Cal.2d 725.) By the majority's destruction of prescriptive rights and resurrection of lost riparian rights, the riparians appear able to claim inverse condemnation.

Until 1913, one acquired a property right in water on three bases: riparian, appropriation or prescription. Water acquired by prescription has been of importance not only in irrigating our great agricultural valleys (1 Rogers & Nichols, Water for Cal., *supra*, § 227, p. 327) but also in serving our cities. Had the Legislature in 1913 or later sought to abrogate one of the three methods of acquiring a property right in water, it would have been a simple matter to so state. The Legislature did not do so. While our discovery of *implied* legislative intent may serve from time to time to furnish minor details to complete a legislative scheme, implied intent should not give the court a basis for radical or fundamental changes in the law. Rather than rely on the 1913 legislation, the majority should candidly admit that they—not the Legislature—prospectively and retroactively abolish property rights in water acquired through prescription.

Richardson, J., concurred.

Respondent's petition for a rehearing was denied March 13, 1980, Clark, J., and Richardson, J., were of the opinion that the petition should be granted.